AO 91 (Rev. 11/11) Criminal Complaint (modified by USAO for telephone or other reliable electronic means)

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| United States of America<br>v.<br><br>CLIFFORD WAYNE BERNARD<br><br>*Defendant(s)* | Case No. 3:24-mj-00655 |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of July 25, 2024 - Oct. 22, 2024, in the county of Montgomery in the Southern District of Ohio, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Counts 1-9: 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) | Distribution of a controlled substance |
| Count 10: 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) | Possession with intent to distribute a controlled substance |
| Count 11: 18 U.S.C. § 922(g) | Possession of a firearm by a prohibited person |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

*/s Sarah Deamron*
*Complainant's signature*

SA Sarah Deamron, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Telephone *(specify reliable electronic means).*

Date: 10/23/24

Peter B. Silvain, Jr.
United States Magistrate Judge

City and state: Dayton, Ohio

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A CRIMINAL COMPLAINT

I, Sarah Deamron, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since June 2015. Upon graduation from the FBI Academy in Quantico, Virginia, I was assigned to the Milwaukee Division, Green Bay Resident Agency, and in October of 2022, I transferred to the Cincinnati Division, Dayton Resident Agency. My primary duties as a Special Agent consist of investigating criminal enterprises, narcotics investigations, organized crime, violent crimes to include unlawful possession and possession with the intent to distribute controlled substances, as well as the associated conspiracies in violation of 21 U.S.C. §§ 841, 843, and 846. I am familiar with federal firearms laws, and investigations into possession of a firearm by a convicted felon, possessing a firearm in furtherance of a drug trafficking crime and the associated violations of 18 U.S.C. §§ 922 and 924. As part of my standard training to become a FBI Special Agent, I have received specialized training in the means and methods by which individuals and criminal enterprises conduct their illegal activities, as well as in the use of various investigative techniques used to uncover unlawful activities. Based upon my experience and training, I am familiar with the ways in which drug traffickers conduct their unlawful drug trafficking activity; including, but not limited to, their use of code words and numbers to conduct their transactions, their use of multiple telephones to conduct their illegal activities, their methods for concealing narcotics and narcotics proceeds and their use of firearms, violence, and threats of violence to protect their criminal organization. I have participated in various types of electronic surveillance, including the interception of wire communications, in investigations of

drug traffickers, money launderers, and violent criminal enterprises. I am also familiar with, and have personally participated in, other normal methods of investigating criminal enterprises; including, but not limited to, visual surveillance, the questioning of witnesses, the use of informants, undercover operations, the use of pen registers, including pen registers in the form of digital analyzers.

2. This affidavit is intended to show only that there is sufficient probable cause for the requested arrest warrant and does not set forth all of my knowledge about this matter. This affidavit is in support of a complaint charging Clifford Wayne BERNARD with violations of Title 21, United States Code §§ 841(a)(1) and 841(b)(1)(C), and Title 18, United States Code, § 922(g). The information set forth in this affidavit is not intended to detail each and every fact and circumstance of the investigation or all the information known to me and other law enforcement investigators. Rather, this affidavit serves only to establish probable cause for the arrest of BERNARD.

**PROBABLE CAUSE**

A. **Overview of Investigation**

3. The United States, including the Federal Bureau of Investigation Dayton Ohio Resident Office, along with the Warren County Drug Task Force ("WCDTF"), is investigating Clifford Wayne BERNARD[1] for violations of federal drug trafficking laws.

---

[1] BERNARD's criminal history includes convictions for breaking and entering, resisting arrest, and felony drug offenses.

2

4. Between July and September 2024, an undercover law enforcement officer conducted nine controlled buys of fentanyl, a Schedule II controlled substance, from BERNARD. The UC arranged each of these buys by contacting BERNARD by phone. During these phone conversations, BERNARD instructed the UC to meet him (BERNARD) at a particular location to conduct the drug deal. Investigators have observed BERNARD travel directly from BERNARD's home, located at 1026 Angier Dr., Dayton, Ohio, to the prearranged meet location to sell the UC fentanyl. This prearranged meet location, chosen by BERNARD, is only a one-minute drive from BERNARD's home.

5. Based on the foregoing information, on October 21, 2024, agents obtained a search warrant for BERNARD's home.

6. On October 22, 2024, BERNARD, using the TARGET CELL PHONE, again agreed to sell the UC fentanyl. Agents arrested BERNARD outside BERNARD's residence just before the controlled buy was to take place. When he was arrested, BERNARD had in his pockets approximately two ounces of a substance that field-tested positive as fentanyl. This is the quantity of fentanyl BERNARD had agreed to sell the UC. Agents searched BERNARD's home pursuant to the federal warrant and found, among other items of evidentiary value, a firearm and approximately one kilogram of a substance that field-tested positive for fentanyl.

**B. Beginning in July 2024, BERNARD sold fentanyl to the UC on nine different occasions.**

7. By at least in or about July 2024, BERNARD was selling fentanyl in the greater Dayton, Ohio area using the cell phone number 937-267-1466 (the "TARGET CELL PHONE").

8. On July 25, 2024, the UC contacted BERNARD on the TARGET CELL PHONE. Using audio and visual surveillance, officers monitored the conversation between the UC and BERNARD. During the conversation, BERNARD told the UC that he (BERNARD) could sell multiple different types of drugs, but mostly "stays in his lane" by selling fentanyl. BERNARD agreed to sell the UC fentanyl that day and directed the UC to the intersection of Richley Ave. and Haller Ave. in the city of Dayton for the transaction.

9. The UC remained in constant visual and audio contact with other officers as the UC drove to the prearranged meeting location. BERNARD directed the UC to park on Haller Ave. As the UC turned onto Haller Ave., the UC observed an unknown white female ("UF-1") parked in a vehicle near the meet location. The UC contacted BERNARD to inform BERNARD that there was someone already at the meet location. BERNARD explained to the UC that UF-1 "is my people" and directed the UC to "turn around and go back."

10. The UC returned to the meet location and UF-1 departed. At the same time UF-1 left the meet location, BERNARD arrived driving a white Nissan Maxima bearing Ohio license plate number JZC5257. The UC parked his/her vehicle next to BERNARD. BERNARD exited the Nissan and walked to the UC's driver side window. BERNARD handed the UC a baggie of suspected fentanyl, and in exchange the UC gave BERNARD pre-recorded U.S. currency.

11. After the controlled buy was complete, the UC reunited with the UC's fellow law enforcement officers. The UC confirmed that the individual who sold the UC fentanyl was BERNARD. The UC also confirmed that BERNARD was the person with whom the UC had spoken to on the TARGET CELL PHONE to arrange the drug deal.

12. Law enforcement agents sent the suspected fentanyl to the Miami Valley Regional Crime Laboratory for forensic analysis, which confirmed that the substance the UC purchased from BERNARD was 14.58 grams of fentanyl.

13. Investigators ran the license plate of the white Nissan Maxima BERNARD drove to the meet location. The vehicle is registered to an individual, "Doe,"[2] with an associated residence of 1026 Angier Dr., Dayton, Ohio ("1026 Angier"). A review of Accurint[3] showed that BERNARD and Doe both reside at 1026 Angier. Significantly, the intersection BERNARD directed the UC to for the drug transaction is only .2 miles from 1026 Angier. I know, based on my training and experience, that drug traffickers frequently drive vehicles registered in other people's names in order to evade detection by law enforcement. I also know that drug traffickers frequently meet their customers at locations convenient to where the traffickers reside and/or store drugs.

14. The UC purchased fentanyl from BERNARD on eight more occasions using the same procedure as the first controlled buy. Specifically, for each of the nine controlled buys, the UC first contacted the TARGET CELL PHONE and spoke to BERNARD to arrange the drug deal. During these phone calls, BERNARD would direct the UC to the same meet location (the intersection of Richley Ave. and Haller Ave. in Dayton, Ohio). The UC, while under constant surveillance by the UC's fellow law enforcement officers, would then meet with BERNARD and

---

[2] I know Doe's name, but I am using his/her initials to protect his/her privacy.

[3] Accurint is a database used by law enforcement.

exchange pre-recorded U.S. currency for fentanyl. Subsequent forensic analysis confirmed that the substance the UC purchased from BERNARD one each occasion was, in fact, fentanyl.[4]

15. The nine controlled buys are summarized in the chart below:

| Date | BERNARD's Vehicle | Drugs Purchased (in grams) | Additional Information |
|---|---|---|---|
| 7/25/24 | White Nissan Maxima, Ohio registration JZC5257 | 14.58 g fentanyl | BERNARD used UF-1 to visually confirm that the UC was a legitimate customer before BERNARD met with the UC. |
| 8/5/24 | Black Oldsmobile, Ohio registration KHG 9269 | 13.87 g fentanyl | BERNARD used counter-surveillance methods to disguise his travel following the transaction. Agents were unable to sustain post-buy surveillance very long due to BERNARD's driving methods. |
| 8/8/24 | Black Oldsmobile, Ohio registration KHG 9269 | 14.08 g fentanyl | BERNARD used counter-surveillance methods to disguise his travel following the transaction. Based on the timing of the transaction (i.e., the time it took for BERNARD to travel to the meet location after talking to the UC), agents determined that it was likely BERNARD lived near the meet location. |
| 8/15/24 | Black Impala, Ohio registration KCB 4719 | 13.83 g fentanyl | Surveillance units saw BERNARD leave the residence at 1026 Angier immediately prior to BERNARD's transaction with the UC. 1026 Angier is a one-minute drive from the meet location. |
| 8/19/24 | Black Impala, Ohio registration KCB 4719 | 26.61 g fentanyl | Surveillance units saw BERNARD leave the residence at 1026 Angier immediately prior to BERNARD's transaction with the UC. |
| 9/3/24 | Grey Dodge Durango, Ohio registration JHB 2504 | 30.17 g fentanyl | The UC called BERNARD once the UC arrived at the meet location. BERNARD told the UC that he (BERNARD) was ten minutes away and needed to "stop and get it." Prior to the buy, surveillance units saw BERNARD arrive at 1026 Angier, enter 1026 Angier, exit 1026 Angier only moments later, then drive directly to the meet location to sell the UC drugs. BERNARD had a female passenger with him and did not travel directly back to 1026 Angier following the drug deal. |

---

[4] The exception is the most recent controlled buy (September 23, 2024). Lab results for this buy are still pending.

6

| | | | |
|---|---|---|---|
| 9/5/24 | Black Impala, Ohio registration KCB 4719 | 54.55 g fentanyl | Surveillance units saw BERNARD exit 1026 Angier and drove directly to the meet location. After BERNARD sold the UC fentanyl, BERNARD drove directly to 1026 Angier and reentered. |
| 9/12/24 | Black Impala, Ohio registration KCB 4719 | 28.10 g fentanyl | Surveillance units saw BERNARD exit 1026 Angier and drive directly to the meet location. After BERNARD sold the UC fentanyl, BERNARD did not travel directly back to 1026 Angier. |
| 9/23/24 | Black Impala, Ohio registration KCB 4719 | Lab test pending— approximately 45 g suspected fentanyl | Surveillance units saw BERNARD exit 1026 Angier and drive directly to the meet location. After BERNARD sold the UC fentanyl, BERNARD did not travel directly back to 1026 Angier. |

**C. In October 2024, agents searched 1026 Angier pursuant to a federal warrant and seized drugs and a firearm.**

16. The UC continued to communicate with BERNARD following the controlled buy on September 23, 2024. For example, in a text message exchange on October 4, 2024, BERNARD, using the TARGET CELL PHONE, texted the UC, "New shit fire," meaning that BERNARD's latest supply of drugs was very high-quality and potent. The UC told BERNARD that he (the UC) was going to pass on buying. On October 14, 2024, BERNARD, using the TARGET CELL PHONE, texted the UC, "Missing out big dog." In response, the UC told BERNARD he (the UC) was going to start buying from BERNARD again soon.

17. On October 20, 2024, at approximately 5:30 a.m., a law enforcement officer conducted surveillance at 1026 Angier and saw the black Impala BERNARD drove to five of the nine drug transactions (including the most recent three) in the driveway of 1026 Angier. Additionally, as of October 20, 2024, the pen register on the TARGET CELL PHONE reflected that the TARGET CELL PHONE was active and was answering both calls and text messages.

7

18.     As summarized in the chart above, BERNARD used several techniques typical of sophisticated, long-term drug traffickers. For example, during the first controlled buy with the UC, BERNARD used one of "his people"—UF-1—to wait at the meet location for the UC to arrive. Drug traffickers frequently use trusted associates to scout out first-time buyers to make sure that the buyers appear to be legitimate (e.g., not law enforcement or a rival drug dealer). BERNARD also used counter-surveillance driving techniques to evade law enforcement detection following the transactions with the UC. For example, in the final two buys, BERNARD's travel immediately following the transaction suggested that he was trying to "clean" himself after the sale—i.e., travel to unrelated locations in an attempt to throw off anyone who might be surveilling him. BERNARD drove quickly from the meet location and headed towards downtown Dayton. Because of how fast BERNARD was driving, surveillance could not keep up. Additionally, BERNARD used four different vehicles to meet the UC for their drug deals. It is advantageous for drug traffickers to use several different vehicles because it makes them more difficult for law enforcement or rival drug dealers to detect and follow.

19.     The quantity of fentanyl BERNARD had ready to sell further suggests that he is a long-term, large-scale drug trafficker. A "user dose" of fentanyl is approximately .02 grams or fewer. BERNARD consistently sold the UC "bulk" quantities of fentanyl—that is, quantities of fentanyl inconsistent with personal use and instead intended for further distribution at the street level. In total, the UC paid BERNARD approximately $7,820 in exchange for fentanyl.

20.     In order to have large quantities of fentanyl ready for resale, BERNARD has likely established a connection with a larger drug trafficking organization ("DTO"). DTOs commonly provide larger quantities of product to trusted associates with whom they have had

8

multiple previous dealings. For example, DTOs often "front" drugs to traffickers and resupply them once the trafficker pays the DTO back for the fronted drugs. Once a trafficker proves himself consistently trustworthy (that is, the trafficker successfully sells the fronted drugs and remits payment to the DTO), the DTO will "front" the trafficker larger quantities. The quantity of fentanyl BERNARD sold the UC thus suggests that BERNARD has a long-running relationship with a DTO. I know, based on my training and experience, that the vast majority of drug traffickers obtain fentanyl from Mexico-based DTOs. Because BERNARD is not manufacturing the fentanyl himself, it is likely that he is being supplied by one of these well-organized, long-running networks, and is able to consistently obtain fentanyl from his source.

21. Based on my training and experience, I know that drug traffickers keep their product stored securely in their residences or other locations they control, such as stash houses. Drug trafficking is a cash-based business, and drug traffickers frequently store their drug proceeds, and/or luxury goods purchased with drug proceeds, at their homes. Additionally, based on my training and experience, I know that drug traffickers often have more than one cell phone and that they keep their cell phones with them on their person or securely stored in their residences.

22. For all of the foregoing reasons, I believed that evidence of BERNARD's drug trafficking—including, but not limited to, the TARGET CELL PHONE and other electronic devices; drugs; drug proceeds; and tools of the drug trafficking trade, such as firearms—were stored at 1026 Angier.

23. Based on the foregoing information, on October 21, 2024, I obtained a federal search warrant for 1026 Angier. On October 22, 2024, before agents executed the search warrant,

the UC arranged for another fentanyl purchase from BERNARD. As in previous drug transactions, the UC contacted the TARGET CELL PHONE to coordinate the drug sale. BERNARD instructed the UC to meet at the same location as their previous sales. Prior to BERNARD meeting the UC, aerial surveillance captured BERNARD at BERNARD's house. When BERNARD confirmed with the UC that he (BERNARD) was on his way to sell the UC drugs, agents arrested BERNARD in front of 1026 Angier. Inside BERNARD's pockets were approximately two ounces of fentanyl (which is the amount BERNARD had just agreed to sell the UC), approximately $5,000 in U.S. currency, and three cell phones.

24. Inside 1026 Angier agents located, among other items of evidentiary value, a firearm on top of a safe in the primary bedroom; approximately one kilogram of a substance that field-tested positive for fentanyl; and other indicia of drug trafficking, including digital scales with residue. The quantity of fentanyl BERNARD possessed at 1026 Angier was a trafficking quantity inconsistent with personal use.

25. The firearm agents recovered from atop the safe in the primary bedroom of BERNARD's residence was a black Glock 33 firearm. This firearm was not manufactured in the state of Ohio, and therefore must have traveled in interstate commerce prior to BERNARD's possession of it on October 22, 2024. I know, based on my training and experience, that drug traffickers frequently possess firearms to protect themselves, their drugs, drug proceeds, as well as luxury items purchased with drug proceeds.

26. Based on my review of records reflecting BERNARD's criminal history, I know that, prior to October 22, 2024, BERNARD had been convicted of a crime punishable by a term of imprisonment exceeding one year, and is therefore prohibited from possessing firearms.

## **CONCLUSION**

27. The above facts set forth probable cause to believe that, while in the Southern District of Ohio, BERNARD violated Title 21, United States Code §§ 841(a)(1) and 841(b)(1)(C), and Title 18, United States Code, § 922(g). Specifically, there is probable cause to believe that BERNARD committed nine violations of distribution of a mixture and substance containing a detectable amount fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code §§ 841(a)(1) and 841(b)(1)(C); one violation of possession with intent to distribute a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance; and one violation of possession of a firearm by a prohibited person, in violation of Title 18, U.S.C., § 922(g). These counts are summarized in the chart below:

| Count | Charge | Date of Offense |
|---|---|---|
| 1 | Distribution of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) | 7/25/24 |
| 2 | Distribution of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) | 8/5/24 |
| 3 | Distribution of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) | 8/8/24 |
| 4 | Distribution of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) | 8/15/24 |
| 5 | Distribution of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) | 8/19/24 |
| 6 | Distribution of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) | 9/3/24 |
| 7 | Distribution of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) | 9/5/24 |
| 8 | Distribution of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) | 9/12/24 |
| 9 | Distribution of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) | 9/23/24 |
| 10 | Possession with intent to distribute fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) | 10/22/24 |

| 11 | Possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g) | 10/22/24 |

Accordingly, I request that an arrest warrant be issued for BERNARD for the above violations.

Respectfully submitted,

/s Sarah Deamron

Sarah Deamron
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me via reliable electronic means on October 23, 2024:

Peter B. Silvain, Jr.
United States Magistrate Judge

12